Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 576 | **DATE** | 5/10/2001 |
| **CASE TITLE** | Domino Amjet, Inc. vs. Zeneca Limited | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: the motion to dismiss for lack of personal jurisdiction is granted and defendant Zeneca Limited is dismissed from this action. Status set for 5/24/01 at 2:30 p.m. (7-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 1 1 2001 | |
| | Notified counsel by telephone. | | date docketed | 30 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TP | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DOMINO AMJET, INC. and DOMINO UK LIMITED, ) ) ) ) | |
| Plaintiffs, ) ) ) | |
| ) | No. 00 C 0576 |
| v. ) ) | |
| ZENECA LIMITED d/b/a ZENECA COLOURS and ZENECA, INC., ) ) ) | Judge John A. Nordberg |
| Defendants. ) ) | |

DOCKETED
MAY 11 2001

## MEMORANDUM OPINION AND ORDER

Defendant Zeneca Limited has filed a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. 12(b)(2). For the reasons set forth below, the motion is granted.

## BACKGROUND

This case involves a dispute arising out of the sale of dye, known as Projet MEK Black dye. The plaintiffs are Domino UK Limited ("Domino UK"), a British company, and Domino Amjet, Inc. ("Domino Amjet"), a Nevada corporation with its headquarters in Illinois.[1] Plaintiffs use the dye to manufacture ink that is then sold to third party users of industrial ink jet printers. The defendants, who sold the dye, are Zeneca Limited ("Zeneca UK") and Zeneca, Inc. ("Zeneca

---

[1] Both corporations are wholly-owned subsidiaries of Domino Printing Sciences, PLC.

-1-

30

US"). Zeneca UK is a British company with its headquarters in London. Zeneca US is a Delaware corporation with its headquarters in Delaware.[2]

In 1989, Domino UK entered into discussions with a predecessor of Zeneca UK regarding the possibility of ordering the dye. (Cmplt. ¶ 7.) In these discussions, all of which took place in Great Britain, Zeneca UK was made aware that the dye would be used not only by Domino UK but also by Domino Amjet in the U.S. and also that Domino UK was negotiating on behalf of both itself and Domino Amjet. However, Domino Amjet was not a part of these negotiations, nor was it ever a party to the later contractual agreements with Zeneca UK. All of the dye directly sold by Zeneca UK was sold to Domino UK. Domino UK used some of the dye for itself and also shipped some of the dye to Domino Amjet in the U.S. Later, beginning in February of 1995, Domino Amjet began purchasing dye directly for itself rather than getting it from Domino UK. This dye was purchased from Zeneca US and not from Zeneca UK.[3]

Domino UK first purchased the dye in 1990 and then periodically made purchases thereafter. (¶ 10.) Plaintiffs allege that all of the purchases from Zeneca UK were made subject to certain express contractual promises made by Zeneca UK. (¶ 11.)[4] In particular, Zeneca UK

---

[2]Zeneca US is a wholly-owned subsidiary of Zeneca UK.

[3]The current motion to dismiss has been filed by Zeneca UK and therefore its resolution will have no effect on the claims against Zeneca US.

[4]Although the complaint refers in paragraph 11 to certain express contractual agreements, the complaint does not further elaborate upon the nature of the alleged contract. *See, e.g.,* ¶ 11 (the parties "expressly agreed" to a particular manufacturing process); *see also* ¶ 64 (stating that Zeneca UK "contractually agreed" to certain things). It is unclear whether these initial promises were made pursuant to a written contract or whether they were oral promises made during the negotiations. There is a later reference in the complaint to certain purchase orders that were submitted by Domino UK to Zeneca UK. (¶ 23.) However, the material quoted from these

allegedly expressly agreed that all of the dye sold would be subjected to a manufacturing process designed to make sure that the dye was stable in its chemical structure. The process consisted of subjecting the dye to a five-week holding period, which allowed sediment to form. This sediment is then removed in a filtration process, leaving the resulting dye free of the type of particulate matter that tends to disrupt sensitive ink jet printers. Zeneca UK also expressly agreed that it would not change this manufacturing process without first notifying Domino UK.

Contrary to these express contractual promises, in December of 1994, Zeneca UK allegedly began supplying Domino UK with dye that had not been subjected to the promised five-week holding process. (¶ 12.)

Sometime in 1995, plaintiffs became concerned about the quality of the ink and began an investigation into raw material and production changes over the past two years. (¶ 16.) As part of this investigation, Domino Amjet's investigators wrote to Zeneca UK, asking whether it had made any changes to the manufacturing process. On March 8, 1995, Zeneca UK sent a fax to Domino Amjet, which stated in relevant part:

> Current quality Projet Black MEK Liquid is giving a reflectance ratio of 0.95. At this level the stability of the product shows no deterioration after standing for a period of five weeks. Longer-term stability is being evaluated.

(*Id.*) Domino Amjet claims that the above passage constitutes a representation and warranty that the five-week holding period test was still a part of the dye manufacturing process.[5]

---

purchase orders does not include the promises referred to in paragraph 11, thus suggesting that the contractual commitments referred to in paragraph 11 were made separately.

[5] Also, sometime shortly before this March 8th fax was sent, John Pesgrave of Zeneca UK visited Domino Amjet's facilities in Gurnee, Illinois as part of a "technical" visit regarding the problem dye.

Based upon this representation and warranty, Domino Amjet believed that the dye supplied by Zeneca US was still subject to the five-week holding period and therefore continued to purchase the dye and also fruitlessly investigated the integrity of numerous other raw materials and production processes. It was not until a July 26, 1995 meeting with Zeneca UK that Domino UK was notified that Zeneca UK had abandoned the five-week holding period test. (¶ 19.) As a result of this change in process, Domino UK and Domino Amjet unknowingly supplied their customers with dye that was chemically unstable and thus not suitable for the intended purpose.

Earlier, in February 1995, Zeneca UK requested that Domino Amjet purchase dye directly from Zeneca US. (¶ 14.) Thereafter, Domino Amjet purchased its dye from Zeneca US. (¶ 15.) However, the dye supplied by Zeneca US was actually manufactured by Zeneca UK.

In their complaint, plaintiffs have asserted twenty claims -- ten similar claims against Zeneca UK and Zeneca US. The claims are: (1) breach of express warranties; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of contract; (5) express indemnification; (6) implied contractual indemnity; (7) strict liability; (8) negligence; (9) contribution; and (10) subrogation.

## ANALYSIS

Both parties agree on the basic legal framework necessary to resolve this motion. Plaintiff has the burden of establishing personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Any factual disputes will be resolved in plaintiff's favor, although we may take as true those facts offered by the defendant that are unrefuted. *Id.* at 1275. Because the federal basis of jurisdiction is diversity, plaintiffs must show that the law of the forum state (Illinois) would permit the exercise of jurisdiction over Zeneca UK and that such an

exercise would not violate Zeneca UK's constitutional due process rights. *Id.* at 1276. Because the Illinois long-arm statute allows jurisdiction to be exercised to the extent permitted by due process, these two inquiries essentially collapse into one such that we may focus on the basic question of due process. *Id.*[6]

In *RAR*, the Seventh Circuit summarized the basic framework for analyzing the federal due process issue in this context:

> The Due Process Clause of the Fourteenth Amendment limits when a state may assert in personam jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733 (1878). A defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). What the standard means in a particular case depends on whether the state asserts "general" or "specific" jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). General jurisdiction, meanwhile, is for suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *Id.* at 416.

\* \* \*

> In specific jurisdiction cases, we must decide whether a defendant has "purposefully established minimum contacts within the forum State" and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). Crucial to the minimum contacts analysis is showing that the defendant "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there, *Burger King*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253

---

[6]Because the parties have not raised any arguments uniquely based on the Illinois Constitution, we will only analyze the issue under the federal due process standard.

> (1958)). To give a concrete example, an out-of-state party's contract with an in-state party is alone not enough to establish the requisite minimum contacts. *See Burger King*, 471 U.S. at 478. Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" must indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant. *Id.* at 479.

*Id.* at 1277 (parallel citations omitted).

Plaintiffs appear to be relying solely on a theory of specific jurisdiction.[7] In support of their argument, they point to certain discrete contacts between Zeneca UK and Domino Amjet. These consist of the March 8, 1995 fax and the "technical" visit to Illinois sometime shortly before then. Plaintiffs also generally refer to various meetings and correspondence between Domino Amjet and Zeneca UK. Finally, relying on the "stream of commerce" theory, plaintiffs argue that jurisdiction is warranted based on the fact that Zeneca UK was told at the beginning of the parties' relationship that some of the dye sold to Domino UK would later be shipped to Illinois.

Before considering plaintiffs' specific arguments, it will be helpful to set forth the factual framework of this overall dispute and to make a few general observations. First, as articulated in the complaint, the heart of this dispute is a contractual relationship between two British

---

[7] Plaintiffs never explicitly make an argument for general jurisdiction. In two places, they set forth facts that may have been intended to support such a claim. First, in the factual section of their response brief, they state that Zeneca UK "promotes itself as a global company." However, this point was never developed in the argument portion of the brief. Moreover, the supporting evidentiary material is flawed. Plaintiffs refer to promotional statements allegedly made on Zeneca UK's website, but the attached materials in support of this assertion consist of what appears to be excerpts from three different websites of affiliated companies. Second, plaintiffs state that Zeneca UK has filed certain patent infringement actions in United States District Courts and then suggest that a party that voluntarily files a legal claim in a district subjects itself to jurisdiction in that district. However, there is no evidence that Zeneca UK ever filed a patent action in this district.

companies that was formed sometime in 1990. The negotiations leading to this relationship took place exclusively in Great Britain. The alleged promises were made there. The goods that are the subject of this dispute were manufactured there and were shipped from one location to another location in Great Britain. The alleged failure to perform the five-week holding period test also took place in Great Britain. In sum, the contract at issue was negotiated, executed, and performed in Great Britain.

Second, the central and overarching assertion made in the complaint is that defendant Zeneca UK failed to live up to its promise of conducting the five-week holding period test on all dye it sold to Domino UK. This promise was allegedly made at the beginning of the relationship in 1990 and thus governed all subsequent purchases of dye from Zeneca UK. The breach of this promise allegedly occurred in December of 1994.

Third, there is no evidence to suggest that Zeneca UK had any ongoing general business contacts with Illinois. Specifically, it is undisputed that Zeneca UK does not: (1) have any offices or operations in Illinois; (2) conduct any business in Illinois; (3) have any customers in Illinois; (4) sell any products in Illinois; (5) conduct any advertising or other solicitation directed at Illinois residents; (6) own any property in Illinois; (7) have any bank accounts in Illinois; or (8) have any contracts, agreements or other relationships with any Illinois residents or corporations.

With these points in mind, we now turn to the specific arguments in support of jurisdiction. The two most prominent contacts are the March 8, 1995 fax and the "technical" visit made shortly before then. The fax was sent from Zeneca UK to Domino Amjet in response to an earlier inquiry by Domino Amjet regarding the possible problems with the dye. Shortly

before the March 8th fax, a Zeneca UK representative (John Pesgrave) made a "technical" visit to Domino Amjet's Gurnee, Illinois facilities.

Plaintiffs argue that sending correspondence into the forum and making technical visits are the types of contacts that usually support jurisdiction. *See, e.g., FMC Corp. v. Varonos*, 892 F.2d 1308 (7th Cir. 1990) (jurisdiction based on the sending of fraudulent telexes from Greece to Chicago). The problem we have with these two contacts is not their nature but their timing. They occurred well after the principal events described in the complaint. As noted above, the focus of this lawsuit is on the contractual relationship formed in 1990 and particularly on the promise made at that time that Domino UK would "adhere to the agreed method of production." (¶ 21). Domino UK allegedly reneged on that promise in December of 1994. In contrast, these two jurisdictional contacts occurred in March of 1995.

As a result, the claims in this case, which are contract-based claims, do not arise out of these two jurisdictional contacts. As noted above, in order to make a claim of specific jurisdiction, the claims must "arise out of" or "be related to" the contacts. *See RAR*, 107 F.3d at 1277. Although these two contacts are related to the claims in a general sense, this relationship is too remote and incidental to justify jurisdiction especially in light of the fact, stated previously, that this case is fundamentally a contractual dispute between two British companies arising out of promises first made sometime in 1990. *See id.* at 1279 (holding that an "incidental aspect" of a larger transaction was "too weak to support personal jurisdiction").

Plaintiffs seem to recognize this weakness in their argument as they now argue, for the first time in their response brief, that the March 8th fax, by itself, is a separate tort claim for misrepresentation. As stated above, the relevant portion of the fax states:

> Current quality Projet Black MEK Liquid is giving a reflectance ratio of 0.95. At this level the stability of the product shows no deterioration after standing for a period of five weeks. Longer-term stability is being evaluated.

Domino Amjet claims that this statement constitutes an explicit warranty that the five-week holding period test would be conducted on all future dye sold.

Putting aside the fact that the current complaint fails to include a claim specifically based on this fax, this argument suffers from several problems. First, it is not clear how the above statement from the fax constitutes the type of affirmative and explicit warranty claimed by plaintiffs. The statement quoted above appears to be more in the nature of a descriptive factual statement about the "current quality" of the dye. Second, and more importantly, any claim based directly on the sending of the fax would relate to the purchases from Zeneca US and not to the purchases from Zeneca UK. As set forth in the complaint, as of February 1995, Domino UK began obtaining its dye from Zeneca US. (¶ 14.) In fact, Domino Amjet states in its brief that the upshot of the alleged misstatement in the March 8th fax was that Domino Amjet continued to utilize the dye that was "supplied by [Zeneca US]". (Pls. Resp. at 5.)[8]

Aside from these two contacts, plaintiffs refer generally to the fact that there were other meetings and correspondence between Domino Amjet representatives in Illinois and Zeneca UK representatives. (Pls. Resp. at 3.) In their response brief, plaintiffs do not further describe the

---

[8]Plaintiffs also rely heavily on *FMC Corp. v. Varonos*, 892 F.2d 1308 (7th Cir. 1990), in which the Seventh Circuit found that personal jurisdiction over an out-of-state defendant was justified based on fraudulent telexes sent from Greece to Chicago. Unlike the present case, however, the contacts in that case were extensive and also were the key part of the fraudulent scheme. *See id.* at 1310 (numerous fraudulent telexes over a two-year period). By contrast, this case involves a single fax that was sent well after the operative events in the complaint. Moreover, this single fax was sent in response to an earlier inquiry from one of the plaintiffs. *Cf. id.* at 1313 (noting that the defendant was the party that "reached out to" the forum).

nature of these contacts. However, they have attached as Exhibit B to their response brief five items that are meant to provide support for this general assertion. These items consist of five letters or memos, dating from November 1993 until August 1994.[9]

These five items are still not enough, in our opinion, to establish the requisite minimum contacts to warrant jurisdiction over Zeneca UK. First, there is again a timing problem. Although these contacts took place earlier than the two 1995 contacts, they still took place at the earliest in November of 1993, which is many years after the start of the relationship in 1990 and after the initial contractual promises were made. Second, these exhibits do not support the broader claim made by plaintiffs. In fact, they provide only minimal evidence of contacts to Illinois. There is a reference in one memo to a meeting at an undisclosed location, which we will assume took place in Illinois. One letter refers to a telephone conversation between representatives of the two companies. Another letter refers to a meeting that was scheduled to take place in Great Britain. Finally, of the five items, only two of them were written by Zeneca UK. It is revealing to note that neither of these two letters were even addressed to Domino Amjet in the U.S. Instead they were sent to Domino UK in Cambridge. This latter fact lends support to the general notion that Zeneca UK interacted primarily with Domino UK and that the contacts with Domino Amjet were ancillary and incidental to that primary relationship. As the

---

[9]These five items are: (i) a November 24, 1993 memorandum on Domino Amjet letterhead summarizing a "Meeting with Zeneca" at an undisclosed location; (2) a February 5, 1994 letter from Domino Amjet to Dr. Cracknell, who presumably is an individual at Zeneca UK; (3) an April 15, 1994 letter from Zeneca UK to Domino UK in Cambridge; (4) an August 29, 1994 memo from Domino Amjet to John Pesgrave at Zeneca, referring to a "recent telephone conversation;" and (5) a November 12, 1993 memo from Zeneca UK to Domino UK in Cambridge, regarding a price increase in the dye.

Seventh Circuit stated in *RAR*, "[p]otential defendants should have some control over [] the jurisdictional consequences of their actions." 107 F.3d at 1278.[10]

Finally, we consider plaintiffs' argument based on the "stream of commerce" theory of jurisdiction. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980) ("The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."); *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102 (1987). Plaintiffs state that, at the beginning of the parties' relationship in 1990, Domino UK knew that some of the dye it was selling would eventually would be sent to Domino Amjet in Illinois and that Domino Amjet would use the dye to manufacture ink that would be sold to customers, some of whom also were in Illinois.

Although this theory does not suffer from the same timing problem discussed above, it ultimately does not fit the facts of this case. As noted above, plaintiffs have come forward with no evidence whatsoever to suggest that Domino UK had any presence in Illinois or was otherwise engaged in a general marketing campaign directed at this state. Instead, this case focuses on a discrete sale to one party. Courts relying on a stream of commerce theory typically have found that the defendant made "a concerted attempt to serve the market" in the forum state. *See, e.g., Dehmlow v. Austin Fireworks*, 963 F.2d 941, 944, 948 (7th Cir. 1992) (defendant had at least 12 regular Illinois customers). Usually there is also an allegation that the defendant utilized

---

[10]Although not developed enough for us to rely on at this stage, there is some evidence suggesting that Zeneca UK and Domino UK entered into a choice of forum clause restricting venue and jurisdiction to the English courts.

a distributional network to send its goods into the forum. By contrast here, the distributor of the product into the forum was one of the plaintiffs, Domino UK, who bought the product and then distributed the product to its affiliated American corporation.

Our conclusion is similar to the one reached by the district court in *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 1998 WL 131738 (E.D. La. March 20, 1998), which refused to apply the stream of commerce theory based on the conclusion that it was not applicable to contract suits involving only an "isolated sale." *Id.* at *4. The court believed that this principle applied as long as the "core" of the suit was contractual, even though the plaintiff may have also asserted some negligence claims along with its contract-based claims. *Id.*; *see also Dalmau Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 15 (1st Cir. 1986) (holding that the stream of commerce theory was not applicable to the sale of two helicopters that later were re-sold to a third party located in the relevant jurisdiction; even if the seller knew that the goods would eventually reach the forum, the sale was not a "stream" but was instead "an isolated splash").

## CONCLUSION

For all the reasons stated above, the motion to dismiss for lack of personal jurisdiction is granted and defendant Zeneca Limited is dismissed from this action.

**ENTER:**

*[signature]*
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** May 10, 2001